SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MOE KESHAVARZI, Cal. Bar No. 223759
SCOTT SVESLOSKY, Cal. Bar No. 217660
DAVID DWORSKY, Cal. Bar No. 272167
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:  213.620.1398
Email:      mkeshavarzi@sheppardmullin.com
            ssveslosky@sheppardmullin.com
            ddworsky@sheppardmullin.com

Attorneys for Plaintiffs
ALTAA Investments, LLC; 18150 Tiger,
LLC; and Pacific Venture Partners, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALTAA INVESTMENTS, LLC, a Delaware Limited Liability Company; 18150 TIGER, LLC, a Delaware Limited Liability Company; and PACIFIC VENTURE PARTNERS, LLC, a Delaware Limited Liability Company,<br><br>          Plaintiffs,<br><br>    v.<br><br>PRODUCTION CAPITAL, LLC, a Delaware Limited Liability Company; KEVIN ROBL, an Individual; IBRAHIM MOHAMMED, an Individual; FRIENDS OF PRODUCTION CAPITAL II, LLC, a Delaware Limited Liability Company; BURGEE AND ABRAMOFF, a California Professional Corporation; and DOES 1 through 50, inclusive,<br><br>         Defendants. | Case No.  2:22-cv-498<br><br>**PLAINTIFFS' COMPLAINT FOR:**<br><br>**1.  BREACH OF CONTRACT (3 DIFFERENT CLAIMS);**<br><br>**2.  BREACH OF FIDUCIARY DUTY;**<br><br>**3.  FRAUDULENT INDUCEMENT;**<br><br>**4.  COMMON LAW FRAUD;**<br><br>**5.  NEGLIGENT MISREPRESENTATION;**<br><br>**6.  CONVERSION;**<br><br>**7.  CIVIL RICO (18 U.S.C. § 1962(c)); AND**<br><br>**8.  CIVIL RICO CONSPIRACY (18 U.S.C. § 1962(d)).**<br><br>**JURY TRIAL DEMANDED** |

-1-

Plaintiffs ALTAA Investments, LLC, 18150 Tiger, LLC, and Pacific Venture Partners, LLC (collectively, "Plaintiffs"), complain against Defendants Production Capital, LLC ("Production Capital"), Kevin Robl ("Robl"), Ibrahim Mohammed ("Ibrahim"), Friends of Production Capital II, LLC ("FOPC II") (Production Capital, Robl, Ibrahim, and FOPC II are referred to herein as the "Enterprise Defendants"), and Burgee and Abramoff, PC ("Abramoff") (together with the Enterprise Defendants, "Defendants"), and allege as follows:

## NATURE OF THE CASE

1. Between 2019 and 2021, the Enterprise Defendants used a fraudulent movie financing scheme to swindle the Plaintiffs out of over $2.75 million.

2. Robl and Ibrahim were the fraud's masterminds. As part of the enterprise, Robl and Ibrahim created and operated a myriad of corporate entities, including Production Capital and FOPC II.

3. The Enterprise Defendants targeted Plaintiffs and other investors by purporting to offer them opportunities to participate in the financing of film productions. However, the investments were fake, and the funds were used for other purposes, including to pay existing creditors, and for the Enterprise Defendants' personal and corporate expenses. Defendant Abramoff helped the Enterprise Defendants accomplish the scam by allowing them to use its client trust account (the "Abramoff Account") for the deposit of Plaintiffs' money, and improperly allowing the transfer of Plaintiffs' money into a Production Capital bank account, where it was never returned to Plaintiffs.

4. The scheme was straightforward. Robl (CEO) and Ibrahim (CFO) founded Production Capital for the purpose of fraudulently soliciting investment funds for non-existent movie deals. Robl also founded FOPC II, a supposed primary lender to and investor in Production Capital. Ibrahim represented that Friends of Production Capital Management, LLC ("FOPCM") was the managing

member of FOPC II, and that FOPCM was Ibrahim's own personal entity.  Robl and Ibrahim convinced investors to part with their money by fabricating Production Capital's relationships with reputable companies, including a Chinese animation studio called BaseFx.  Ibrahim then used his connection to the Plaintiffs to solicit investment funds on Robl's behalf, using a series of lies and misrepresentations perpetuated by Robl about Production Capital.

5.      For example, Ibrahim told Plaintiffs that Production Capital was a short-term financing solution for companies in the film production industry, and that one component of Production Capital's core business is operating as the "credit facility" for BaseFx, a visual effects and animation company with studios in China, Malaysia, and the United States.  Plaintiffs are informed and believe, and based thereon allege, that this representation was false, and that Robl and Ibrahim completely misconstrued Production Capital's relationship with BaseFx.

6.      Between 2019 and the present, Ibrahim solicited investment capital from each of the Plaintiffs based on Robl's and Ibrahim's false representations about Production Capital, its financial health, its relationship with BaseFx, and other lies.  As detailed more fully below, the Enterprise Defendants represented that the Plaintiffs' investment funds would be used to finance certain film projects, and that the Plaintiffs would be paid their principal investment, plus interest, after certain defined time periods.

7.      However, Robl's and Ibrahim's representations about Production Capital were false.  Rather than using the investment funds for the stated purpose, Plaintiffs are informed and believe, and based thereon allege, that the Enterprise Defendants absconded with their money, and used it to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

8.      Moreover, in order to provide an illusion of legitimacy and to further entice the Plaintiffs to invest their funds with Production Capital, the Enterprise Defendants represented that Plaintiffs' money from a large investment relating to a

movie called Groove Tails would reside in the Abramoff Account and not be moved until the principal amounts were returned.  That representation was also false.

9.     After Plaintiffs wired funds into the Abramoff Account for the Groove Tails deal, Ibrahim and Robl had the funds transferred into a Production Capital account.  Ibrahim claimed that by doing so, Production Capital would be able to repay the investors directly and without delay.

10.     However, Ibrahim later admitted that he had no control or authorization over, or access to, the Production Capital account.  Plaintiffs are informed and believe, and based thereon allege, that after they deposited the Groove Tails funds into the Abramoff Account, someone at Production Capital improperly withdrew the funds and transferred them into a Production Capital account controlled by Robl.  The money was then stolen and used to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

11.     Ibrahim knew, or should have known, that Robl wanted the money transferred into a Production Capital account so that Robl could use the money to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.  In fact, Robl has admitted on multiple occasions that he did not use the Plaintiffs' investment funds for the stated purpose, and that he intended to pay Plaintiffs back using other investors' money.

12.     The Enterprise Defendants' ponzi-like scheme constitutes an ongoing pattern of racketeering activity, for which Plaintiffs seek recovery under the Racketeer Influenced and Corrupt Organizations statutes and common law claims.

## **PARTIES**

13.     Plaintiff ALTAA Investments, LLC ("ALTAA") is a Limited Liability Company organized and existing under the laws of the state of Delaware, that regularly conducts business in the State of California.  ALTAA's principal and managing member is Talib Fakhri ("Fakhri").

14.    Plaintiff 18150 Tiger, LLC ("18150 Tiger") is a Limited Liability Company organized and existing under the laws of the state of Delaware, that regularly conducts business in the State of California.  Fakhri is one of 18150 Tiger's members.

15.    Plaintiff Pacific Venture Partners, LLC ("PVP") is a Limited Liability Company organized and existing under the laws of the state of Delaware, that conducts business in the State of California.  PVP's principal and managing member is Ali Rashid ("Rashid").

16.    Defendant Production Capital, LLC ("Production Capital") is a Limited Liability Company organized and existing under the laws of the State of Delaware, that regularly conducts business in the State of California.

17.    Defendant Kevin Robl ("Robl") is an individual residing in the State of California, County of Los Angeles.  Robl is Production Capital's co-founder and current Chief Executive Officer.

18.    Defendant Ibrahim Mohammed ("Ibrahim") is an individual residing in the State of California, County of Los Angeles.  Ibrahim claims to be Production Capital's co-founder and Chief Financial Officer.

19.    Defendant Friends of Production Capital II, LLC ("FOPC II") is a Limited Liability Company organized and existing under the laws of the State of Delaware, that regularly conducts business in the State of California.  Ibrahim has represented to Plaintiffs that he is the Managing Member of FOPC II, through Ibrahim's personal entity, FOPCM.

20.    Defendant Burgee and Abramoff, PC ("Abramoff") is a Professional Corporation organized and existing under the laws of the State of California, that regularly conducts business in the State of California.  Abramoff's principals are John Gerard Burgee, Esq. and Robert William Abramoff, Esq.

21.    As set forth more fully below, all of the Enterprise Defendants are liable for the amounts owed to Plaintiffs in this case, either directly under the

contracts set forth herein, or as alter egos, successor corporations, or under a single enterprise theory of liability.  Each of the Enterprise Defendants participated in the illegal conduct, or agreed to facilitate the scheme, including the racketeering activities alleged herein.

22.     Plaintiffs are informed and believe, and based thereon allege, that the Enterprise Defendants constituted a single enterprise.  Adherence to the fiction of the separate existence of the Enterprise Defendants in this case as distinct entities would permit an abuse of the corporate privilege and would promote injustice in that a sufficient unity of interests and ownership exists between all of the Enterprise Defendants such that any separateness between them has ceased to exist.

23.     Plaintiffs are further informed and believe, and based thereon allege, that all of the Enterprise Defendants are the alter egos of each other, in that they exercise dominion and control over each other, commingle funds, treat each other's assets as their own, pay each other's debts, fail to respect corporate formalities such as the maintenance of adequate corporate records, and keep their true ownership and control concealed from third parties like the Plaintiffs.  Adherence to the fiction of the separate existence of the Enterprise Defendants in this case as distinct entities would permit an abuse of the corporate privilege and would promote injustice in that a sufficient unity of interests and ownership exists between all named Enterprise Defendants such that any separateness between them has ceased to exist.

24.     Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 50. Such Defendants are, therefore, sued herein by fictitious names.  Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named Defendants was in some way responsible for, participated in or contributed to the matters and things of which Plaintiffs complain herein, and in some fashion have legal responsibility therefore, whether vicariously, directly as alter egos, successor corporations, or under a single enterprise theory of liability.  When the exact nature

and identity of such fictitious defendants and their responsibility for, participation in
and contribution to the matters and things herein alleged is ascertained, Plaintiffs
will seek leave to amend this Complaint to set forth the same.

## JURISDICTION AND VENUE

25.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 because
certain of the claims asserted herein arise under the laws of the United States.

26.     Jurisdiction is also proper because each of the individual Defendants
resides in this judicial district, and each corporate Defendant regularly conducts
business in this judicial district.  Defendants have also subjected themselves to the
jurisdiction of this Court by virtue of their contracts with Plaintiffs.

27.     To the extent original jurisdiction does not otherwise exist over any
claims in this lawsuit, this Court has supplemental jurisdiction over such claims
under 28 U.S.C. § 1367 as they are so related to claims in the action within such
original jurisdiction that they form part of the same case or controversy under
Article III of the United States Constitution.

28.     Venue is proper, under 28 U.S.C. section 1391(b), because the events
giving rise to the allegations in this Complaint occurred in this district.

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

29.     The scheme perpetrated by the Enterprise Defendants against Plaintiffs
began sometime in 2019.  Working as Robl's agent, Ibrahim approached his cousin,
Muhammad Adaya ("Adaya") to offer him an "investment opportunity" in
Production Capital.  During these initial conversations, Ibrahim told Adaya that
Kevin Robl was a well-known film financier and long-time friend of over 20 years,
and that Production Capital was the financing arm of a reputable production
company called BaseFx, as well as other production companies.  Ibrahim said that
Production Capital provided loans to BaseFx in order to finance BaseFx's post-

production work on films.  Ibrahim also said that Robl was an equity owner of BaseFx, and that Production Capital earned a significant return on its loans once the films were finalized and sold to an end distributor.

30.     Ibrahim told Adaya that Production Capital accepted investment capital from outside investors to help fund certain of these loan projects, and presented Adaya with an opportunity to invest in a film project called "Wish Dragon."  Adaya then told Fakhri about the opportunity, and connected Fakhri with Ibrahim, who made the same representations to Fakhri about Robl and Production Capital.  Fakhri and Adaya, through corporate entities, invested in the Wish Dragon project. Production Capital timely paid back Fakhri's full investment plus interest.

31.     Based on the successful Wish Dragon investment, Fakhri believed that Ibrahim's representations about Production Capital and its relationship with BaseFx were legitimate, and he wanted to pursue additional opportunities.  To that end, during 2019, 2020 and 2021, Fakhri and Adaya participated in additional investment deals with Production Capital.  In doing so, Fakhri relied on Ibrahim's and Robl's representations about Production Capital's business and relationship with BaseFx.

32.     In reality, as part of a "long con," Robl and Ibrahim set a trap for the Plaintiffs.  Plaintiffs are informed and believe, and based thereon allege, that Production Capital repaid the early investments made by Fakhri with the intention of appearing legitimate and reliable, in order to lull Fakhri and others to make much larger future investments.  Robl and Ibrahim then pressured Plaintiffs to make larger investments so that they could steal Plaintiffs' money.

**The Groove Tails Deal**

33.     On August 11, 2021, Ibrahim sent a text message to Fakhri stating that he had a "very attractive 2 week or less deal," relating to a movie called Groove Tails.  He claimed that Production Capital was attempting to raise $5 million as principal to complete an insurance bond for the movie, which was supposedly

-8-

intended to secure star talent.  Production Capital claimed that A-list stars, including Jamie Foxx, were connected to the movie and that the movie was ready to start filming immediately.  As a result, Ibrahim stated that the $5 million investment had to be raised quickly.  He told Fakhri that the investment would yield a 4% return and that Production Capital would repay funds within 14 days.  If the principal amounts were not repaid within a week, the interest would automatically increase to 5%.

34.     Based on Ibrahim's representations, and in reliance on Production Capital's performance on the earlier deals, Fakhri informed his friend, Ali Rashid ("Rashid") about the Groove Tails opportunity, and Rashid expressed interest in participating in the deal.  In August of 2021, Fakhri and Rashid participated in numerous phone calls with Ibrahim and Robl about the Groove Tails deal.  During one call, Ibrahim strongly encouraged Fakhri and Rashid to participate in the deal, telling them that the investment funds had to be wired immediately and that there was no time for Rashid to perform legal diligence on the investment.

35.     Robl and Ibrahim also told Fakhri and Rashid that due to the large amount of the Groove Tails investment, the investment funds would be placed in an attorney/client trust account at Burgee and Abramoff (the Abramoff Account), which was described as the law firm retained for the deal, and that the funds would not be moved.  Ibrahim told Fakhri and Rashid that this was the most secure deal Production Capital had ever offered, because the money would sit idle in the Abramoff Account and the investors would be repaid within days.  In fact, Ibrahim stated multiple times that the investment carried "no risk."  Plaintiffs relied on these representations about the deal's low risk in deciding to invest their funds.

36.     On or around August 13, 2021, Robl, through Ibrahim, provided Fakhri and Rashid with a "Transaction Summary" detailing the Groove Tails investment. See Exhibit A.  The "Transaction Summary" included the following details:

- Purpose:  Provide sufficient funding to allow film completion guarantor, Unify Guarantee, to issue a film completion guarantee bond

for "Groove Tales" [sic], and thereby deem the film fully financed, allowing A list talent to begin working on the project.

- Lender to Grooves Tales [sic]:  Production Capital LLC
- Loan Structure:  1ˢᵗ Position
- Form of Loan:  Delivery of Production Capital's funding to Burgee & Abramoff Atty Client Trust account.  Guarantor has acknowledged such delivery will be a credit to the bond's "Strike Price" to allow the bond to become effective.  Borrower has acknowledged that the lender's <u>only</u> <u>required</u> performance under the loan is delivery to Burgee & Abramoff Atty Client Trust account.  (Emphasis in original)
- **Collateral**  100% principal collateral coverage **in cash** in Atty Client Trust account
- **Interest Rate**  5% interest; due and payable at earlier of: 1) maturity; or 2) receipt of interest from "Groove Tales [sic]"
- **Prepayment Discount**  1%, provided return of principal to lenders on or before 7 calendar days from the effective date of the loan
- **Return of Principal**  14 days
- **Maturity of Loan**  30 days

37.  Based on the representations made by Robl and Ibrahim about the investment, and in reliance on the reduced risk inherent in having the funds secured in the Abramoff Account, Fakhri and Rashid decided to have their companies invest a total of $2.75 million in the Groove Tails project as follows:

- ALTAA Investments LLC (Fakhri) invested $1,150,000
- 18150 Tiger LLC (Fakhri) invested $850,000
- Pacific Venture Partners LLC (Rashid) invested $750,000

38.  Fakhri and Rashid wired the funds from these entities' accounts into the Abramoff Account on or around August 13, 2021.  Adaya also invested a significant amount in the Groove Tails project.

**The Groove Tails Web Quickly Unravels**

39.    On or around August 13, 2021, Robl, on Production Capital's behalf, executed a Promissory Note and Irrevocable Instruction and Direction of Payment relating to the Groove Tails investment.  See Exhibits B and C.  Robl signed both documents on behalf of Production Capital.  Id.

40.    The Promissory Note listed Production Capital as the borrower, and included ALTAA, 18150 Tiger, and PVP on the table of lenders.  Id.  The note detailed the terms of the loan, including the following:

- The Loan Principal plus interest would be due "no more than fourteen (14) calendar days following the deposit of the full amount of the Loan Principal by the Lenders to the Borrower's attorney's client trust account."

- If the Loan Principal is not paid on or before the Repayment Date … or upon the occurrence of an Event of Default, the principal balance of this Promissory Note shall be immediately due and payable and the undersigned promises to pay interest on the principal balance of this Promissory Note at an interest rate [of 3% per month] (an annual rate of 36% of 0.099% per diem).

- The only approved use of the Loan Principal will be to satisfy the bonding requirements of the bonding company

- "The Loan Principal and all funds from the loan are to be held in trust – Burgee & Abramoff Client Trust Account"  (See Exhibit B).

41.    The Irrevocable Instruction and Direction of Payment was signed by Robl and Abramoff, and contained the following terms (See Exhibit C):

- Lenders consent to pay the Loan Principal directly into the Abramoff Account

- "The Loan Principal is not allowed to be released directly to Groovetails Movie, LLC … and will remain in Burgee & Abramoff Attorney Client Trust Account."
- The Loan Principal will be returned to Lenders pursuant to the instructions on file … but in no event later than 14 calendar days
- Payment instructions cannot be modified without the express written consent of Borrower's attorney and Lenders.

42.     Despite Robl's and Ibrahim's representations, and the multiple signed agreements stating that the investment funds would sit in the Abramoff Account, the Enterprise Defendants absconded with the Groove Tails investment funds.

43.     As stated above, Plaintiffs wired funds into the Abramoff Account through various entities on August 13, 2021.  According to the deal terms, the money should have been sent back to the Plaintiffs, with interest, within 14 days.  However, that did not happen.

44.     On August 23, 2021, 10 days after Plaintiffs deposited the investment funds into the Abramoff Account, Ibrahim suggested that to Fakhri that he should agree to allow the funds to be moved into a Production Capital account, from which Production Capital could easily make payment back to Plaintiffs within 1 business day.  Ibrahim stated that moving the funds would speed up the repayment process, because Robert Abramoff's wife was in the hospital with health issues and Mr. Abramoff was unable to send any outgoing wires from the Abramoff Account.  However, Ibrahim now admits that he never had control over, or access to, the Production Capital account.  He admits that he made a "mistake" by not verifying the transactions and by proposing a transfer of funds into an account over which he had no access or control.

45.     Based on Ibrahim's representations that Abramoff could not wire funds due to Mr. Abramoff's wife's health problems, and Ibrahim's representation that the funds would be repaid within 1 business day, Fakhri agreed that Ibrahim could move

his funds into a Production Capital account.  Rashid never agreed.  However, neither Fakhri nor Rashid directly spoke with anyone at Abramoff, nor did they directly authorize Abramoff to allow the funds to be released.

46.     On August 30-31, 2021, Ibrahim sent text messages to Fakhri stating that Robert Abramoff's wife was still very sick, and that as a result he was unable to wire the funds out of the Abramoff Account and into the Production Capital Account.  On September 1, 2021, Robl stated during a telephone call with Ibrahim and Fakhri that the funds could not be transferred due to Mr. Abramoff's wife's illness and hospitalization.  Ibrahim offered the same excuse for days, blaming Mr. Abramoff for not being able to wire any funds out of the Abramoff Account.

47.     Finally, on September 7-8, 2021, Ibrahim informed Fakhri that he intended to finally transfer the funds out of the Abramoff Account and into a Production Capital account.  Ibrahim again told Fakhri that by transferring the funds into the Production Capital account, he could quickly and easily wire the money back to the Plaintiffs, since Mr. Abramoff was unable to do so.

48.     In order to calm any concern that Fakhri and Rashid might have, Ibrahim forwarded them both an email from Robl on September 8, 2021.  The email purported to attach a Wells Fargo account detail reflecting over $16 million in the Abramoff Account.  Robl sent this email to Ibrahim in an attempt to prove that Plaintiffs' funds were in the Abramoff Account.  However, the Wells Fargo statement reflected that an outgoing wire had occurred on August 30, 2021, during the exact time that Robl claimed Abramoff was unable to wire money out of the Abramoff Account due to Mr. Abramoff's wife's illness.  Fakhri and Rashid noticed the outgoing wire after the money was already moved out of the Abramoff Account.

49.     On September 8, 2021, Ibrahim sent Fakhri and Rashid a photo of a purported cashier's check in the amount of $5,050,000, made out to Production Capital.  The $5,050,000 represented the total investment in the Groove Tails project - $2.75 million through Plaintiffs' entities, and $2.3 million in other

investors' funds.  Ibrahim again represented that the full amount was taken from the Abramoff Account and would be deposited into a Production Capital account so that it could be distributed to the investors.  He also sent a follow-up text message to Fakhri on September 13, 2021, in which he provided the supposed cashiers' check number and stated that the amount had been withdrawn from the Abramoff Account and placed in hold with Chase, which presumably was the Production Capital account.

50.     The following day, on September 14, 2021, Ibrahim sent a text message to Fakhri stating that the amount had been deposited into a Production Capital account, and provided branch information.  He claimed that a Production Capital employee named Paul Salvail had deposited the check.  Fakhri and Rashid repeatedly asked Robl and Ibrahim for proof that the money had been deposited into the Production Capital account, but no such proof was ever provided.

51.     Instead, after the funds were withdrawn from the Abramoff Account, the Enterprise Defendants simply stole the money.  Plaintiffs are informed and believe, and based thereon allege, that someone at Production Capital acting on Robl's behalf improperly transferred the funds from the Abramoff Account into the Production Capital account, after which the Enterprise Defendants absconded with the money and used it to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

52.     In allowing the redirection of the funds, Abramoff either improperly or negligently allowed the funds to be released from the Abramoff Account, without direct verification or confirmation from the investors.

53.     To date, despite making some principal payments, Production Capital owes Plaintiffs the following ***principal*** amounts pertaining to the Groove Tails deal:

- $1,040,476 remains due and owing to ALTAA Investments, LLC
- $493,506 remains due and owing to Pacific Venture Partners, LLC
These amounts do not include interest owed to each investor.

54.    Robl has admitted to Fakhri and Rashid numerous times that their investment funds were used for other purposes.  Based on those admissions, Plaintiffs are informed and believe, and based thereon allege, that Production Capital never intended for the investment funds put up for the Groove Tails project to be used to secure a bond financing for the film, but instead intended to use them to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.  Plaintiffs are further informed and believe, and based thereon allege, that once the Groove Tails investment funds were moved out of the Abramoff Account, the Enterprise Defendants commingled them with other funds and used them for the improper purposes described above.

**The Meg 2 Deal**

55.    The Groove Tails deal is not the only deal that Robl and Production Capital solicited through Ibrahim, and which has proven to be fake.

56.    On or around May 28, 2021, Ibrahim approached Fakhri with a different purported deal relating to a movie called Meg 2 (the "Meg 2 Deal"). Ibrahim sent an email to Fakhri on May 28, 2021, claiming that Production Capital was financing the Meg 2 visual effects work through BaseFx and that it was a "new screamer deal."  In this email, Ibrahim also claimed that Robl owned part of BaseFx and that Production Capital provided BaseFx with $50 million in financing.  Ibrahim claimed that Production Capital was looking to raise an additional $5 million for Meg 2, which would be raised through Class C shares in an entity called FOPC II, and that FOPC II could repay investors with 15% interest in 120 days.

57.    In the same email, Ibrahim represented that Robl's personal equity in BaseFx would secure the investment in Meg 2.  He also claimed that a completion bond would secure the investment.  Moreover, Ibrahim represented that his brother, whom Fakhri knows well, invested $1 million in the Meg 2 deal.

58.     In reliance on Ibrahim's and Robl's representations, around June 17, 2021, Fakhri invested $850,000 in FOPC II for the Meg 2 Deal through his corporate entity, 18150 Tiger, LLC.

59.     According to the terms of the Meg 2 Deal, 18150 Tiger was owed the principal plus 15% interest on or before October 16, 2021, which was a 120 day turnaround, as stated in the Meg 2 agreement.  However, that day came and went, and FOPC II did not make any payment to Fakhri.

60.     Fakhri has asked for multiple updates about the status of the Meg 2 Deal, but neither Robl nor Ibrahim has provided any information whatsoever. Plaintiffs are therefore informed and believe, and based thereon allege, that the Meg 2 Deal was never real.  Plaintiffs are also informed and believe, and based thereon allege, that the funds Fakhri invested in the Meg 2 Deal were moved into a Production Capital account, from which the Enterprise Defendants used the funds to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

**The Purported "Class A" Shares**

61.     In addition to the above examples, which involved specific movie deals, Ibrahim and Robl participated in a general, ongoing fraud relating to investment in Production Capital.

62.     Specifically, in or around June of 2020, Ibrahim represented to Fakhri and others that they could purchase what he referred to as "Class A" shares in FOPC II, which would provide a fund that invested pro rata for use by Production Capital in its film financing deals.  Ibrahim represented that holders of these "Class A" shares could receive quarterly preference payments of 5% on their investment, and would have rights to "redeem" their shares.  If "Class A" shareholders redeemed their shares, the investment would be payable at the end of the following quarter.

63.     In reliance on these representations, in or around June of 2020, Fakhri invested $200,000 in the FOPC II "Class A" shares through his entity ALTAA Investments, LLC.

64.     In addition to the representations that Ibrahim made about the return on the FOPC II Class A shares, Fakhri also relied on all prior representations Ibrahim and Robl made about Production Capital's business, which are detailed herein.

65.     ALTAA did not receive a 5% quarterly preference payment for its Class A shares on October 1, 2021 (Q3), or January 3, 2022 (Q4).

66.     In November of 2021, Fakhri submitted a redemption notice for his Class A shares, seeking to "cash out" his principal amount.  Days later, Ibrahim redeemed the Class A shares for all of his investors at his own discretion, and told Fakhri that as the investors' fiduciary, he felt obligated to redeem their shares due to his perception that Production Capital was experiencing cash flow issues.  Ibrahim never mentioned this to Fakhri prior to Fakhri submitting his redemption notice.

67.     Fakhri is informed and believes, and based thereon alleges, that Ibrahim and Robl have stolen the principal amounts he invested with ALTAA to purchase the FOPC II Class A shares.

68.     Fakhri has asked Ibrahim and Robl for multiple updates about the status of his Class A shares and the redemption notice, and they have not provided any updates.  Plaintiffs are informed and believe, and based thereon allege, that the Class A shares solicited by Robl and Ibrahim were never real, and that the funds Fakhri invested in the Class A shares were moved into a Production Capital account, from which the Enterprise Defendants used the funds to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

69.     In total, the Enterprise Defendants have worked together to steal over $2.75 million from the Plaintiffs, using the various investment schemes described above.  The total *principal* amounts owed to the Plaintiffs include:

- $1.24M owed to ALTAA Investments, LLC

   o $1.04M from the Groove Tails investment

   o $200,000 from the FOPC II Class A shares

- <u>$850,000 owed to 18150 Tiger, LLC</u> from the Meg 2 Deal, via FOPC II Class C shares

- <u>$493,506 owed to Pacific Venture Partners, LLC</u> from the Groove Tails investment

70. Plaintiffs are informed and believe, and based thereon allege, that Robl and Ibrahim have been using Production Capital, FOPC, FOPC II, FOPC Management, LLC, and various other entities to run a complex ponzi scheme. Plaintiffs allege that the Enterprise Defendants use investors' money not to finance film productions, but instead to pay off other creditors and/or for other improper purposes, such as personal and/or business expenses.

71. Plaintiffs are informed and believe, and based thereon allege, that Production Capital and Robl were previously partnered with an entity called Knightsbridge Entertainment, which was exposed by the SEC as a ponzi scheme in 2020 and whose principal, Remington Chase, is Robl's close personal and business associate.

## <u>FIRST CLAIM FOR RELIEF</u>

**(Breach of Contract by Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC Against Defendants Production Capital and Robl Relating to the Groove Tails Investment)**

72. Plaintiffs reallege and incorporate by reference paragraphs 1 through 71, inclusive, as through fully set forth herein.

73. Written contracts exist between Plaintiffs and Production Capital relating to the Groove Tails investment, including the Promissory Note and the Irrevocable Instruction and Direction of Payment.  (<u>See</u> Exhs. B and C).  Robl is liable under these contracts as the alter ego of Production Capital.

74.     Plaintiffs performed all obligations they were required to perform under the Promissory Note and the Irrevocable Instruction and Direction of Payment, including depositing the initial investment funds into the Abramoff Account as described in the contracts.

75.     Production Capital breached the Promissory Note and the Irrevocable Instruction and Direction of Payment by failing to repay the Loan Principal within 14 days and failing to pay full interest upon default.  Production Capital also breached the agreements by instructing Abramoff to allow the investment funds to be moved from the Abramoff Account and into a Production Capital account.

76.     As a direct and proximate result of this breach, Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC have been damaged in a total amount of at least $1,533,982, plus interest.

## SECOND CLAIM FOR RELIEF

**(Breach of Contract by Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC Against Defendant Abramoff Relating to the Groove Tails Investment)**

77.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 76, inclusive, as through fully set forth herein.

78.     The Irrevocable Instruction and Direction of Payment is a written contract that exists between Plaintiffs and Abramoff relating to the Groove Tails investment.  (See Exh. C).

79.     Plaintiffs performed all obligations they were required to perform under the Irrevocable Instruction and Direction of Payment, including depositing the initial investment funds into the Abramoff Account as described in the contract.

80.     Abramoff breached the Irrevocable Instruction and Direction of Payment by allowing the investment funds to be moved out of the Abramoff Account, despite the contract stating that the funds would remain in the Abramoff

Account and that the payment instructions could not be modified with the express written consent of Abramoff and the Plaintiffs.  Moreover, neither Fakhri nor Rashid directly spoke with anyone at Abramoff at any time, nor did they directly authorize Abramoff to allow the funds to be released, which was required under the contract.

81.     As a direct and proximate result of this breach, Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC have been damaged in a total amount of at least $1,533,982, plus interest.

## THIRD CLAIM FOR RELIEF

**(Breach of Fiduciary Duty by Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC Against Defendant Abramoff Relating to the Groove Tails Investment)**

82.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 81, inclusive, as through fully set forth herein.

83.     Defendant Abramoff owed Plaintiffs a fiduciary duty by virtue of its agreement to hold Plaintiffs' funds in the Abramoff Account.

84.     By acting as a fiduciary, Abramoff owed a duty to Plaintiffs to be diligent in maintaining the Abramoff Account, and to ensure that the Groove Tails investment funds remained in the Abramoff Account as required by the Irrevocable Instruction and Direction of Payment and as agreed to by Abramoff.

85.     Abramoff was aware that the funds were removed from the Abramoff Account, as the funds could not have been withdrawn from the Abramoff Account without Abramoff's authority and involvement.  Nevertheless, Abramoff failed to sufficiently act to prevent the investment funds from being moved out of the Abramoff Account.  This constituted a breach of Abramoff's duty to Plaintiffs.

86.     Abramoff's breach of its duty to oversee the Abramoff Account and ensure that the funds remained in the account was a direct and proximate cause of

-20-

Plaintiffs' injuries.  But for Abramoff's breach, Plaintiffs' funds would remain in the Abramoff Account and would be able to be returned.

87.     As a direct and proximate result of this breach, Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC have been damaged in a total amount of at least $1,533,982, plus interest.

## FOURTH CLAIM FOR RELIEF

**(Breach of Contract by Plaintiff 18150 Tiger Against Defendants Production Capital and Robl Relating to the Meg 2 Deal)**

88.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 87, inclusive, as through fully set forth herein.

89.     A written contract exists between Plaintiff 18150 Tiger and Production Capital relating to the Meg 2 Deal, as reflected in the May 28, 2021 email from Ibrahim to Fakhri.  Robl is liable under this contract as the alter ego of Production Capital.

90.     18150 Tiger performed all obligations it was required to perform under this agreement, including depositing the investment funds for the Meg 2 Deal with Production Capital.

91.     Production Capital breached the terms of the agreement by failing to repay the Meg 2 investment, plus 15% interest, within 120 days.

92.     As a direct and proximate result of this breach, 18150 Tiger has been damaged in an amount of at least $850,000, plus interest.

## FIFTH CLAIM FOR RELIEF

**(Fraudulent Inducement by all Plaintiffs Against Defendants Robl and Ibrahim)**

93.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 92, inclusive, as through fully set forth herein.

-21-

94.     This claim is asserted against Defendants Robl and Ibrahim on behalf of all Plaintiffs, who each made investments from 2019 through the present.

95.     Robl and Ibrahim made materially false representations to Plaintiffs. Ibrahim is Production Capital's CFO and Robl is Production Capital's CEO, and they purport to be co-founders of the business.  Both individuals had direct involvement in Production Capital's day-to-day operations, and were involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action.  Robl and Ibrahim also made numerous materially false verbal representations to the Plaintiffs.

96.     Robl and Ibrahim knew at the time they were inducing Plaintiffs to invest in Production Capital that they were omitting material facts that Plaintiffs were entitled to know, and would want to know, and which would impact Plaintiffs' decision to invest in Production Capital.  For example, Robl and Ibrahim knew that the funds being solicited for the Groove Tails investment were not going to be used to secure bond financing, but would in fact be used for other purposes.

97.     Nevertheless, in order to induce the Plaintiffs to wire money for the purported Groove Tails deal, Ibrahim sent a text message to Fakhri on August 11, 2021.  In the message, Ibrahim stated that Production Capital needed a $5 million investment "to allow the completion guarantee bond to go effective" and that the investment funds "do not leave the atty client trust account until bond has been issued and Jamie Foxx reports for filming …."  Ibrahim said in the same message that, at that point, "funds then returned to lenders, with interest payment to follow within a couple of days."

98.     In order to induce the Plaintiffs to wire money for the purported Groove Tails deal, Robl signed the Transaction Summary, Promissory Note and Irrevocable Instruction and Direction of Payment on or around August 13, 2021, and sent those documents to Fakhri and Rashid.  (Exhs. A-C).  Each document stated, in unequivocal terms, that Plaintiffs' money was being used to secure bond financing,

that the money would be held in the Abramoff Account and would not be moved, and that Plaintiffs would be repaid within 14 days.

99.     These representations were all false.  The Plaintiffs' funds were never used to secure a bond financing, and Production Capital withdrew the funds from the Abramoff Account even though both Ibrahim and Robl said that the money would remain in the account.  Ibrahim claimed he was moving the funds from the Abramoff Account to a Production Capital account so that Production Capital could repay Plaintiffs out of that account.  However, that representation was false, as Ibrahim later notified Fakhri and Rashid that he never had control over the Production Capital account, and could not access it to repay the funds.  Production Capital still owes Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC $1,533,982, plus interest for the Groove Tails investment alone.

100.   Robl and Ibrahim intended that Plaintiffs would rely on their material misrepresentations and omissions in deciding to invest in Production Capital.  These misrepresentations and omissions include providing Plaintiffs seemingly legitimate transaction documents that were signed with forged signatures, as alleged herein.

101.   In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above-described deals.  Plaintiffs would not have made these investments, and would not have suffered economic loss, had true information been disclosed.  Plaintiffs' reliance upon these statements was reasonable.

102.   Robl's and Ibrahim's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions.  Their misstatements and omissions concealed facts that negatively affected the risk and value of Plaintiffs' investment.

103.   As a direct and proximate result of Robl's and Ibrahim's wrongful conduct, Plaintiffs have suffered damages in the amount of at least $2.75 million, plus interest.

## SIXTH CLAIM FOR RELIEF

**(Common Law Fraud by all Plaintiffs Against Defendants Robl and Ibrahim)**

104.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 103, inclusive, as through fully set forth herein.

105.  This claim is asserted against Defendants Robl and Ibrahim on behalf of all Plaintiffs, who each made investments from 2019 through the present.

106.  Robl and Ibrahim made materially false representations to Plaintiffs. Ibrahim is Production Capital's CFO and Robl is Production Capital's CEO.  They purport to be co-founders of the business.  Both individuals had direct involvement in Production Capital's day-to-day operations, and were involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action. They also made numerous materially false verbal representations to the Plaintiffs.

107.  Robl and Ibrahim knew at the time they were inducing Plaintiffs to invest in Production Capital that they were omitting material facts that Plaintiffs were entitled to know, and would want to know, and which would impact Plaintiffs' decision to invest in Production Capital.  For example, Robl and Ibrahim knew that the funds being solicited for the Groove Tails investment were not going to be used to secure bond financing, but would in fact be used for other purposes.

108.  Nevertheless, in order to induce the Plaintiffs to wire money for the purported Groove Tails deal, Ibrahim sent a text message to Fakhri on August 11, 2021.  In the message, Ibrahim stated that Production Capital needed a $5 million investment "to allow the completion guarantee bond to go effective" and that the investment funds "do not leave the atty client trust account until bond has been issued and Jamie Foxx reports for filming ...."  Ibrahim said in the same message that, at that point, "funds then returned to lenders, with interest payment to follow within a couple of days."

109.  In order to induce the Plaintiffs to wire money for the purported Groove Tails deal, Robl signed the Transaction Summary, Promissory Note and

Irrevocable Instruction and Direction of Payment on or around August 13, 2021, and sent those documents to Fakhri and Rashid.  (Exhs. A-C).  Each document stated, in unequivocal terms, that Plaintiffs' money was being used to secure bond financing, that the money would be held in the Abramoff Account and would not be moved, and that Plaintiffs would be repaid within 14 days.

110.   These representations were all false.  The Plaintiffs' funds were never used to secure a bond financing, and Production Capital withdrew the funds from the Abramoff Account even though both Ibrahim and Robl said that the money would remain in the account.  Ibrahim claimed he was moving the funds from the Abramoff Account to a Production Capital account so that Production Capital could repay Plaintiffs out of that account.  However, that representation was false, as Ibrahim later notified Fakhri and Rashid that he never had control over the Production Capital account, and could not access it to repay the funds.  Production Capital still owes Plaintiffs ALTAA Investments, LLC and Pacific Venture Partners, LLC $1,533,982, plus interest for the Groove Tails investment alone.

111.   Robl and Ibrahim intended that Plaintiffs would rely on their material misrepresentations and omissions in deciding to invest in Production Capital.

112.   In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above-described deals.  Plaintiffs would not have made these investments, and would not have suffered economic loss, had true information been disclosed.  Plaintiffs' reliance upon these statements was reasonable.  Ibrahim made repeated assurances to Fakhri and Rashid about Production Capital's success and the security of their investments.  But for his repeated, confident representations and warranties about Production Capital and Robl, Fakhri and Rashid would have never invested their money into the deals described above.

113.   Robl's and Ibrahim's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions.  Their

-25-

misstatements and omissions concealed facts that negatively affected the risk and value of Plaintiffs' investment.

114.   As a direct and proximate result of Robl's and Ibrahim's wrongful conduct, Plaintiffs have suffered damages in the amount of at least $2.75 million, plus interest.

**SEVENTH CLAIM FOR RELIEF**

**(Negligent Misrepresentation by all Plaintiffs Against Defendant Ibrahim)**

115.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 114, inclusive, as through fully set forth herein.

116.   The relationship between Plaintiffs and Defendant Ibrahim constituted a relationship in which Plaintiffs maintained deep trust, dependence, confidence, counsel, and reliance in Ibrahim.

117.   Ibrahim made materially false representations to Plaintiffs.  He was a top officer and purported co-founder of Production Capital, and had direct involvement in its day-to-day operations.  He was also involved in drafting, producing, reviewing, and/or disseminating the documents at issue in this action, and made materially false verbal representations to the Plaintiffs.

118.   Even if Ibrahim may have honestly believed that the representations he made to Plaintiffs were true, he had no reasonable grounds for believing them to be true when he made the representations, due to his position at Production Capital and the knowledge he had of Production Capital's operations.

119.   Ibrahim intended that Plaintiffs would rely on his misrepresentations and omissions and invest in Production Capital.

120.   In reliance and as a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the Plaintiffs invested in the above-described deals.  Plaintiffs would not have made these investments and suffered the associated economic loss had the true

information been disclosed.  Plaintiffs' reliance upon Ibrahim's and Robl's statements was reasonable.

121.   Ibrahim's misstatements and omissions pertained to the very risk that was concealed by those same misrepresentations and omissions.  His misstatements and omissions concealed facts that negatively affected the risk and value of Plaintiffs' investment.

122.   As a direct and proximate result of Ibrahim's and Robl's wrongful conduct, Plaintiffs have suffered damages in the amount of at least $2.75 million, plus interest.

## EIGHTH CLAIM FOR RELIEF

### (Conversion by all Plaintiffs Against Defendants Production Capital, Robl, Ibrahim and FOPC II)

123.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 122, inclusive, as through fully set forth herein.

124.   Plaintiffs owned and had a right to possess the money that they invested into the Abramoff Account.  At no time should the money have left the Abramoff Account, and Plaintiffs had a right to recover their full investment plus interest after 14 days.

125.   Defendants Ibrahim, Robl, Production Capital and FOPC II, and each of them, substantially interfered with Plaintiffs' property by intentionally taking possession of the money Plaintiffs deposited into the Abramoff Account, as well as the funds Plaintiffs invested for the Meg 2 Deal and the FOPC II Class A shares.

126.   Defendants Ibrahim, Robl, Production Capital and FOPC II, and each of them, have prevented Plaintiffs from having access to their investment funds, and have refused to return the funds despite numerous demands by the Plaintiffs.

127.   Plaintiffs did not consent to have their money taken by Ibrahim, Robl, Production Capital and/or FOPC II, and did not consent to have their money held

-27-

longer than the amount of time agreed to in each specific deal and commingled with other funds to be used for other purposes.  In fact, Ibrahim always presented the deals to Fakhri by describing them as "short term" investment opportunities.

128.   As a direct and proximate result of the wrongful conduct of Ibrahim and Robl, Plaintiffs have suffered damages in the amount of at least $2.75 million plus interest.

## NINTH CLAIM FOR RELIEF

### (Civil RICO 18 U.S.C. § 1962(c) by all Plaintiffs Against Defendants Production Capital, Robl, Ibrahim and FOPC II)

129.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 128, inclusive, as through fully set forth herein.

130.   Plaintiffs and the Enterprise Defendants are all "persons" as that term is defined in 18 U.S.C. § 1961(3).

131.   Defendants Production Capital and FOPC II, and individual Defendants Ibrahim and Robl, including all of their employees and agents, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the "Investment Scheme."

132.   The Investment Scheme is an ongoing organization consisting of a variety of legal "persons" that associated for common and shared purposes, including: (a) to defraud investors out of money by misrepresenting material facts about Production Capital, its financial state, and its business model; (b) to use new investor funds to pay off existing creditors and/or to pay unrelated personal and business expenses; (c) to falsify business records and deal documents to inflate the value of Production Capital and provide false security about the risk level of the investments; (d) to attempt to ease investors' concerns by claiming that funds would remain in the Abramoff Account, when in reality those funds would be moved elsewhere; (e) to use false and unregistered security instruments that lacked any real

value; (f) to forge signatures and create false email accounts to convey the appearance of partnership with legitimate businesses such as BaseFx, including multiple instances of forging the signature of BaseFx's founder and CEO, Chris Bremble; and (g) to conceal the true nature of the risk to investors and the purpose and use of investors' funds.

133.   The Enterprise Defendants coordinated with one another to implement and conceal the Investment Scheme.  Each Enterprise Defendant operated, managed and/or participated in the Investment Scheme, and the Enterprise Defendants worked together to execute the fraud.

134.   Robl and Ibrahim co-founded Production Capital as a vehicle to defraud investors.  They used prior relationships with businesses such as BaseFx to dupe investors into believing they had legitimate business relationships, and they falsified Production Capital's financial records, including balance sheets, income statements, and tax returns, to make Production Capital appear profitable and financially secure.  They also used Production Capital and FOPC II as shell entities to hold investor funds, and then operated the entities as clearing houses from which they would transfer investment money to any number of other entities they controlled, or directly to third-party creditors.  They commingled investor funds, and used new investor funds to pay off old investors.  The deals they marketed in order to obtain investor funds were, at least in some cases, not real.  For example, Ibrahim and Robl claimed that they were seeking a $5 million investment to secure a bond financing for Groove Tails.  In reality, the money was never intended to secure a bond financing, and Robl and/or Ibrahim stole the money and used it for their own personal debts, the debts of Production Capital and/or FOPC II, or for personal and/or business expenses.

135.   The Investment Scheme has functioned as a continuing enterprise since at least 2019, when Ibrahim first solicited investment money from Adaya and Fakhri for the Wish Dragon deal.

136.   The goal of the Investment Scheme was to provide a financial windfall for the Enterprise Defendants using investors' money.  They were able to avoid scrutiny for a period of time by using new investment dollars to pay old investors, but as with any Ponzi scheme, the house of cards must collapse.  Unfortunately, when this house of cards collapsed, Plaintiffs lost millions.

137.   Plaintiffs relied on the numerous lies and misrepresentations told by Robl and Ibrahim in deciding to invest in Production Capital, to their own detriment.

138.   The Enterprise Defendants necessarily used the mail and wires to perpetrate the Investment Scheme.  For example, numerous of the Enterprise Defendants' misrepresentations about Production Capital's core business, relationship with BaseFx, and fraudulent deal documents were created, discussed, and sent to Plaintiffs via email, text message, and the telephone.  The Enterprise Defendants communicated with each other using the mail, email, and telephone as they managed and operated the Investment Scheme, including but not limited to exchanging ideas and instructions for carrying out the Enterprise's activities, sharing falsified documents, and discussing ways to "buy time" to avoid scrutiny about the true nature of their activities.  This constitutes a pattern of racketeering activity by mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

139.   The Investment Scheme also has a strong nexus to interstate and foreign commerce.  In order to execute the Investment Scheme, the Enterprise Defendants falsified documents and email addresses relating to interests in China and Hong Kong.  For example, Plaintiffs are informed and believe, and based thereon allege, that the Enterprise Defendants used the instrumentalities of Hong Kong to create a fake email address for Chris Bremble, the CEO of BaseFx, and used the email address to communicate with Plaintiffs in furtherance of the Investment Scheme.  Ibrahim and Robl also informed Plaintiffs that Production Capital has substantial holdings in China, and that Production Capital could repay

-30-

COMPLAINT

the Plaintiffs' investment once the Chinese currency could be repatriated into the United States.  Plaintiffs are also informed and believe, and based thereon allege, that Production Capital has multiple bank accounts across the United States, including in Ohio, and that the stolen investment funds were illegally wired across state lines into these accounts.  As a result, the Investment Scheme, by definition, involves interstate and/or foreign commerce.

140.   The Enterprise Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Plaintiffs to suffer substantial injury because the Enterprise Defendants' pattern of racketeering activity caused Plaintiffs to invest in the Investment Scheme, and caused them to lose over $2.75 million in investment funds that would not otherwise have been incurred, as alleged herein above.

141.   The Investment Scheme's racketeering activity was fraudulently concealed from Plaintiffs as alleged herein above.  Even after Fakhri and Rashid confronted Ibrahim and Robl about the use of their funds, the Enterprise Defendants continued to lie and present false excuses about why the funds were not repaid.  For example, Ibrahim told Fakhri and Rashid that Production Capital was working on a new deal with Netflix for a movie called "Lord of the West" ("LOW"), and presented Fakhri and Rashid with a purported assignment for funds from the LOW deal to the Groove Tails investors that would be used to repay the Plaintiffs' investment.  Plaintiffs are informed and believe, and based thereon allege, that the LOW deal was fake, and the documents provided by Ibrahim, which purported to be signed by a Netflix Vice President named Jung Cheng, were unverified or forged.

142.   The Enterprise Defendants' fraudulent conduct continues to this day.  On November 29, 2021, Robl and Ibrahim contacted Fakhri and Rashid in a supposed attempt to work out a deal.  Robl offered the Plaintiffs a lien on his house in exchange for more time to repay their funds.  However, Plaintiffs are informed and believe, and based thereon allege, that the property is already encumbered by a $2.6 million tax lien, and that there is little or no equity remaining in the home.

Plaintiffs are informed and believe, and based thereon allege, that this purported "offer" was just another fraudulent attempt by Robl and Ibrahim to buy time and avoid a potential lawsuit.

143.   These misrepresentations of fact made to Plaintiffs in writing and by telephone are additional predicate acts of mail and wire fraud performed by and in furtherance of the Investment Scheme.  Plaintiffs relied on all of these fraudulent representations and omissions to their own detriment and financial injury.

144.   As a direct and proximate result of the Enterprise Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least $2.75 million.  Under the provisions of 18 U.S.C. § 1964(c), the Enterprise Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

## TENTH CLAIM FOR RELIEF

### (Civil RICO Conspiracy 18 U.S.C. § 1962(d) by all Plaintiffs Against Defendants Production Capital, Robl, Ibrahim and FOPC II)

145.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 144, inclusive, as through fully set forth herein.

146.   The Enterprise Defendants formed an agreement to violate 18 U.S.C. § 1962(c).  Each Enterprise Defendant knew of the Investment Scheme's conspiracy to defraud Plaintiffs and other investors in Production Capital by presenting fraudulent financial records and other information, and offering false investments.

147.   Each Enterprise Defendant agreed to join this conspiracy, and each agreed to commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

148.   During the conspiracy's existence, each of the Enterprise Defendants agreed to the commission of an indefinite stream of predicate acts in furtherance of the Investment Scheme.

149.   The Enterprise Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by mailing and wiring fraudulent financial records, deal documents, and other contracts to investors including Plaintiffs.  The Enterprise Defendants also devised the scheme, created and forged certain deal documents, sent fake investment details to Plaintiffs and other investors, and concealed the Investment Scheme from the Plaintiffs in written and oral communications through the mail, email and telephone.

150.   As a direct and proximate result of the Enterprise Defendants' unlawful racketeering activity, Plaintiffs suffered and continue to suffer damages in an amount to be proven at trial, but of at least $2.75 million.  Under the provisions of 18 U.S.C. § 1964(c), the Enterprise Defendants are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

**WHEREFORE, PLAINTIFFS PRAY FOR JUDGMENT AS FOLLOWS:**

<u>**ON THE FIRST CLAIM FOR RELIEF**</u>

1.     For compensatory damages of $1,533,982 and further damages as to be proven at the time of trial;

2.     For attorneys' fees and costs; and

3.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

**ON THE SECOND CLAIM FOR RELIEF**

1.      For compensatory damages of $1,533,982 and further damages as to be proven at the time of trial;

2.      For attorneys' fees and costs; and

3.      For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

**ON THE THIRD CLAIM FOR RELIEF**

1.      For compensatory damages of $1,533,982 and further damages as to be proven at the time of trial; and

2.      For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

**ON THE FOURTH CLAIM FOR RELIEF**

1.      For compensatory damages of $850,000 and further damages as to be proven at the time of trial; and

2.      For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

**ON THE FIFTH CLAIM FOR RELIEF**

1.      For general and special damages in an amount to be proven at trial, but in no event less than $2.75 million, plus further damages as to be proven at the time of trial;

2.      For punitive and exemplary damages; and

3.      For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

<u>**ON THE SIXTH CLAIM FOR RELIEF**</u>

     1.     For general and special damages in an amount to be proven at trial, but in no event less than $2.75 million, plus further damages as to be proven at the time of trial;

     2.     For punitive and exemplary damages; and

     3.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

<u>**ON THE SEVENTH CLAIM FOR RELIEF**</u>

     1.     For general and special damages in an amount to be proven at trial, but in no event less than $2.75 million, plus further damages as to be proven at the time of trial;

     2.     For punitive and exemplary damages; and

     3.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

<u>**ON THE EIGHTH CLAIM FOR RELIEF**</u>

     1.     For general and special damages in an amount to be proven at trial, but in no event less than $2.75 million, plus further damages as to be proven at the time of trial;

     2.     For punitive and exemplary damages; and

     3.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

<u>**ON THE NINTH CLAIM FOR RELIEF**</u>

     1.     For general and special damages in an amount to be proven at trial;

     2.     For mandatory treble damages;

     3.     For reasonable attorneys' fees; and

-35-

4.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

### ON THE TENTH CLAIM FOR RELIEF

1.     For general and special damages in an amount to be proven at trial;

2.     For mandatory treble damages;

3.     For reasonable attorneys' fees; and

4.     For pre-judgment and post-judgment interest thereon at the maximum rate permitted by law.

### ON ALL CLAIMS FOR RELIEF

1.     For all costs incurred by Plaintiffs to date and to be incurred by Plaintiffs hereafter in connection with this action;

2.     For prejudgment interest; and

3.     For such other and further relief as the Court deems just and proper.

Dated:  January 24, 2022       SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____

MOE KESHAVARZI
SCOTT SVESLOSKY
DAVID DWORSKY

Attorneys for Plaintiffs
ALTAA INVESTMENTS, LLC; 18150 TIGER, LLC; and PACIFIC VENTURE PARTNERS, LLC

-36-

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  January 24, 2022          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    MOE KESHAVARZI
                    SCOTT SVESLOSKY
                    DAVID DWORSKY

                    Attorneys for Plaintiffs
                ALTAA INVESTMENTS, LLC; 18150 TIGER,
                LLC; and PACIFIC VENTURE PARTNERS, LLC

-37-

SMRH:4859-6667-4692.11                                        COMPLAINT